1
2
3
4

# UNITED STATES DISTRICT COURT

5

### EASTERN DISTRICT OF CALIFORNIA

6

7   DAVID FLORENCE,

8                     Plaintiff,

9          v.

10   KERNAN, *et al.*,

11                     Defendants.

12

Case No.  1:19-cv-00331-NONE-BAM (PC)

FINDINGS AND RECOMMENDATIONS RECOMMENDING DISMISSAL OF ACTION, WITH PREJUDICE, FOR FAILURE TO STATE A CLAIM

(ECF No. 46)

**FOURTEEN (14) DAY DEADLINE**

13          Plaintiff David Florence ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma*

14   *pauperis* in this civil rights action under 42 U.S.C. § 1983.

15          Plaintiff's second amended complaint, filed August 30, 2021, (ECF No. 46), is currently

16   before the Court for screening.

17   **I.       Screening Requirement and Standard**

18          The Court is required to screen complaints brought by prisoners seeking relief against a

19   governmental entity and/or against an officer or employee of a governmental entity.  28 U.S.C.

20   § 1915A(a).  Plaintiff's complaint, or any portion thereof, is subject to dismissal if it is frivolous

21   or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary

22   relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b).

23          A complaint must contain "a short and plain statement of the claim showing that the

24   pleader is entitled to relief. . . ."  Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not

25   required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

26   conclusory statements, do not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell*

27   *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  While a plaintiff's allegations are taken as

28   true, courts "are not required to indulge unwarranted inferences."  *Doe I v. Wal-Mart Stores, Inc.*,

1  572 F.3d 677, 681 (9th Cir. 2009) (internal quotation marks and citation omitted).

2  To survive screening, Plaintiff's claims must be facially plausible, which requires

3  sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable

4  for the misconduct alleged. *Iqbal*, 556 U.S. at 678 (quotation marks omitted); *Moss v. U.S. Secret*

5  *Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). The sheer possibility that a defendant acted unlawfully

6  is not sufficient, and mere consistency with liability falls short of satisfying the plausibility

7  standard. *Iqbal*, 556 U.S. at 678 (quotation marks omitted); *Moss*, 572 F.3d at 969.

8  **II.     Plaintiff's Allegations**

9  Plaintiff is currently housed at Pelican Bay State Prison in Crescent City, California. The

10  events at issue in the complaint took place while Plaintiff was housed at North Kern State Prison

11  in Delano, California.[1] Plaintiff names the following defendants: (1) S. Kernan, Secretary of

12  CDCR; (2) R. M. Diaz, CDCR Secretary; (3) K. Allison, CDCR Secretary; (4) J. Macomber,

13  CDCR Under Secretary; (5) C. Gipson, CDCR Director of Division of Adult Institution; (6) M.

14  Voong, CDCR Chief Inmate Appeals Officer; and (7) Doe Defendant. All Defendants are sued in

15  their individual capacities. Plaintiff alleges as follows:

16  California Department of Corrections and Rehabilitation (CDCR) has the following levels

17  of prisons: Level I, Level II, Level III, Level IV-270, Level IV-180. In addition, they have lock-

18  up units Administrative-Segregation (Ad-Seg) and Security Housing Unit (SHU), and they all

19  differ from each other.

20  Prior to 1989, Plaintiff associated with a street gang called Compton Neighborhood Crips

21  and still associates with them. CDCR refers to this gang in prison as a strategic threat group

22  (STG).

23  There are multiple Neighborhood Compton Crips members in CDCR, along with other

24  Compton Crips that do not like snitches, and if it was known to them Plaintiff was on a Non-

25  Designated Program Facility (NDPF) with Sensitive Need Yard (SNY) who are really protective

26  custody (PC) inmates who snitched on other inmates, they would stab or assault him for it.

27

28  [1] Plaintiff also includes events that took place while Plaintiff was housed at Pelican Bay State
Prison. However, these events occurred after Plaintiff initiated this action.

2

1   Because Plaintiff would be considered to them a SNY inmate since he is on NDPF associating

2   with them.

3       To Plaintiff's personal knowledge, in 1992 CDCR policy for all male inmates sentenced

4   to life in prison was to send them to a Level IV General Population (GP) prison, especially

5   inmates serving life without parole (LWOP), and they were to remain there until they showed

6   positive programming and their points went down.

7       For male inmates serving indeterminate sentence of seven, fifteen, and twenty-five years

8   to life, when their points went down for good behavior they were allowed to be placed on Levels

9   III, and II, but for inmates who were serving sentences of LWOP the policy was to retain them on

10  a Level IV permanently, regardless of their positive programming.

11      From Plaintiff's personal knowledge, CDCR did not have a protective custody (PC)

12  housing unit, or facilities for inmates who informed on inmates, and in the late nineties CDCR

13  created SNY, which are PC yards for inmates who feared for their personal safety, because they

14  informed on inmates, stole from inmates, owed inmates, were rapists, child molesters, and did not

15  want to be involved in prison gangs, dealing with the racial issues between the racial groups

16  which CDCR is built on, and just wanted to program.

17      Because of CDCR promoting the SNY policy, telling inmates who came to the reception

18  center, they should go SNY if they did not want to get into the prison politics and just wanted to

19  do their time and go home, and making inmates who feared for their safety and just wanted to

20  leave a yard for owing debts, disrespecting an inmate of a different race than his, or other

21  personal reasons inform on another inmate, before they went to the SNY, CDCR would not have

22  the SNY GP problem.

23      Multiple inmates for the above reasons and more went to SNY thinking they were going

24  to go over to SNY and commit to positive programming, but did just the opposite, robbing

25  inmates, stealing from inmates, continuing to inform on inmates.

26      The inmates on the SNYs have started up multiple prison gangs like, Gay Boy Gangsters,

27  Two-Fives, Independent Riders, etc.  Now the SNYs are more dangerous than GP yards, which

28  threaten Plaintiff's safety and security other inmates and the institutions.

3

1   Because the SNY inmates have informed on GP inmates, are rapists and child molesters,

2   the SNYs cannot be on GP yards, and the SNY inmates hate GPs for that and the two groups will

3   attack each other on sight.

4   In 2012, CDCR changed their policy of retaining LWOP inmates on Level IVs and

5   allowed them to go to Level IIIs.

6   In 2015, all GP races agreed to stop all hostilities with each other and started

7   programming with each other.  This did not include SNY inmates.

8   CDCR saw that the agreement was working, and there was no racial tension or violence

9   between the GP inmates and started sabotaging the GP inmates by manipulating the situation to

10   create violence by forcing GP and SNY inmates to go to the same yard together, knowing both

11   groups have hostility against each other and would attack each other.

12   In 2017, CDCR changed their policy again from retaining LWOP inmates on Level IIIs

13   and allowed them to go to Level IIs.

14   In 2018 ,Plaintiff received a CDCR Department Memorandum (DM) dated December 12,

15   2017 concerning Defendants Allison, Kernan, Diaz, Pogue, Macomber, Gipson, and Kibler[2] all

16   conspiring to implement a policy of Non-Designated Program Facilities (NDPF).  (*See* Second

17   Amended Complaint, ECF No. 46, pp. 37–38.)

18   The DM states, it is the goal of CDCR to continue implementation of NDPF Program

19   Facilities (PFs) that do not identify as SNY or GP.  CDCR's Level I and II Housing Facilities will

20   slowly be transitioned into NDPF as they currently house a large population of programming

21   inmates.  (*Id.* at 38.)  Institutions must document in the committee action or reception

22   classification documents that the inmate was advised of programming expectations and positive

23   programming reasoning for referral to a NDPF.  The inmate's preference and agreement or

24   disagreement shall be documented.  (*Id.*)  Transfer into a NDPF will not require a CDCR Form

25   128-B General Chrono, waiving prior SNY designation or willingness to program.  Inmate's non-

26   compliance with transfer and/or housing placement recommendations shall be subject to

27

---

[2] The Court notes that Plaintiff no longer names Pogue and Kibler as defendants in this action.

28   (ECF No. 46, p. 6.)

departmental disciplinary process and potential placement into a higher level housing.  (*Id.*)

All defendants are supervisors of CDCR, directly participated, directed the violations, knew of the violence between GP and SNY inmates, knew the NDPF policy was deficient, was the moving force of the violation and failed to take any corrective action.

Several times in 2018 while Plaintiff was at North Kern State Prison (NKSP), Warden K. Santoro, B. Kibler Captain C. Arce, and K. Santoro's other subordinates have attempted to integrate GP inmates into the Level II and Fire House, which is all SNY, but when the GP and SNY inmates came within feet of each other they attacked each other every time.

On March 14, 2018, Plaintiff filed appeal NKSP-18-000906 against Defendants Kernan, Allison, Diaz, and Voong for conspiring to place Plaintiff's life, as a GP inmate, in danger by implementing a policy of forcing inmates who are GPs to go to Levels I and II NDPF, (i*d.* at 33, 35), to integrate with SNY inmates who are PC who have informed on GP inmates, and if Plaintiff refuses, retaliate against Plaintiff by disciplining him and sending him to a higher security level.  (*Id.* at 38.)

Plaintiff has asked CDCR officials what is the policy if an inmate gets kicked off the NDPF? Do they get transferred back to a GP yard or SNY, because as it stands, no inmate could come from a SNY and go to a GP yard without being physically assaulted.  They never responded.  (*Id.* at 35.)

CDCR has Fire Camps, Level I's, Level II's, Level III's, Level IV-270 and Level IV-180 prisons, but is only making GP and SNY inmates integrate with each other in Level I's and II's.

Defendant Allison stated in a DM dated April 26, 2018: In April of 2016 a SNY summit was convened to develop a plan which would address the growing SNY population and the associated increase in violence which was occurring on SNY facilities.  (*Id.* at 48.)

On October 6, 2018 while at NKSP, Plaintiff received a Rule Violation Report and stated to the Lieutenant, I bought a cell phone and placed it in my cell to intentionally get caught with it, because I did not want to go to a NDPF with SNY inmates.  (*Id.* at 53–54.)

On March 12, 2019, Inmate J. Nunez K-63350 received a response from the Office of Administrative Law (OAL): This is in response to your letter February 28, 2019 received by the

OAL, wherein you request any filing with OAL of any change or regulation papers that concerns the NDPF.  I was unable to locate any documents filed.  (*Id.* at 59.)

On March 14, 2019, Plaintiff received a Third Level Review (TLR) from Defendant Voong regarding appeal NKSP-18-00906: Despite Plaintiff's dissatisfaction, this review finds no evidence of a violation of existing policy, regulation or state law.  (*Id.* at 44–45.)  The TLR notes Plaintiff has not been assigned to a NDPF and is currently housed at NKSP Level III and has not received any disciplinary actions in regards to refusal to go to NDPF.  California Code of Regulation (CCR) Title 15 3000 which was promulgated through the Administrative Procedure Act along with California Penal Code (PC).  (*Id.* at 45.)  Under California PC § 5058 the Secretary of the Department is authorized to establish rules to govern the classification of inmates to ensure the safety and security of staff, inmates and public.  (*Id.*)

Plaintiff had a nervous breakdown and was sent to Enhance Outpatient Program (EOP) during which time Plaintiff discovered there were SNY inmates there.  The officials did not tell him this, Plaintiff had to file an appeal to be removed, because his life was in danger being around SNYs.

Plaintiff filed Case No. 2:11-cv-03119, *Florence v. E. Colter*, regarding Defendant Correctional Officer (C/O) E. Colter retaliating against him by calling Plaintiff a snitch in front of a group of inmates, causing Plaintiff to be physically assaulted by several Compton Crips while at NKSP.  Part of the assault was for being in EOP around SNY inmates.

On May 15, 2019, Defendant Gipson put out a DM regarding the NDPF: Placement in a NDPF will be involuntary, staff shall utilize the procedures within this DM pending regulatory change to CCR Title 15.  (*Id.* at 60–61.)

After being transferred on January 30, 2020 from NKSP, which is a Level III, to Pelican Bay State Prison (PBSP), which is a Level II, no SNYs were here, and there has not been any violence between any GP inmates.

On February 2, 2020, Plaintiff was taken to PBSP classification committee and given a CDC-128 chrono which reads in part: You are advised CDCR has implemented a NDPF.  This advisement does not indicate your agreement.  (*Id.* at 62–63.)

In December 2020, Correctional Counselor at PBSP came to the housing units letting all GP inmates know they were bringing in some SNY inmates and stating, they were going to take every GP inmate to classification to see if they wanted to stay or leave.

On March 4, 2021, PBSP administration started taking some GP inmates to classification stating they were bringing in some SNY inmates and asking the GP inmates if they wanted to stay or leave.  When the administration saw how many inmates wanted to be transferred, they put a lot of GP inmates in housing units D 2 and 3, transferred a few inmates and told the rest of the inmates they were not being transferred and sent them back to housing units throughout Facility D in violation of the DM dated December 12, 2017.  (*Id.* at 38.)

After bringing in the SNY inmates into PBSP the following violence started taking place:

1. On May 10, 2021, C/O's took two GP inmates to PBSP Level I and they got into a fight with several SNY inmates.

2. On May 11, 2021, C/O's took two more GP inmates to PBSP Level I and they got into a fight with several SNY inmates.

3. On June 7, 2021, the C/O's brought some SNY inmates into Facility D and the GP inmates beat them up.

4. On June 10, 2021, a SNY inmate got beat up by some GP inmates on Facility D.

5. On June 10, 2021, a SNY inmate got stabbed multiple times, including in the eye in Facility D-4.

6. On June 14, 2021, a SNY inmate got beat up on Facility D.

7. On June 16, 2021, a SNY got stabbed in Facility D-6.

8. On June 17, 2021, two SNY inmates got beat up on Facility D.

9. On June 18, 2021, a SNY inmate got stabbed multiple times, including in the eye on Facility D Yard.

10. On June 21, 2021, PBSP Associate Warden A. Pepiot put out a memorandum stating: Due to the recent violence on Facility D, in which many weapons were found to be made from the center rod of the 9 inch fans, effectively all fans will be collected.  (*Id.* at 64.)

11. On June 23, 2021, Plaintiff filed appeal PBSP 132240 stating: There has been no violence between any inmates all inmate races have been getting along with each other, recently PBSP brought in some SNYs to integrate them with GP inmates and on the following date there were incidents between inmates who are GP and SNY.

12. On June 23, 2021, a GP inmate got beat up by a SNY inmate on Facility D.

13. On June 25, 2021, Plaintiff received a letter from Ying Sun Associate Director Regulation and Policy Management Branch (RPMB) which reads in part: This is in response to your letter received by RPMB regarding NDPF.  You asked if changes were filed with the OAL and whether OAL approved this policy, the RPMB is unaware of any regulation.  (*Id.* at 65.)

14. On June 28, 2021, a SNY inmate beat up a GP inmate on Facility D.

15. On June 29, 2021, a GP inmate and SNY inmate were fighting in Facility D-9.

16. On July 2, 2021, a SNY inmate got stabbed in Facility D-5.

17. On July 2, 2021, a SNY inmate beat up a GP inmate on Facility D-1.

18. On July 2, 2021, a GP inmate and SNY inmate got into a fight in Facility D-2.

19. On July 5, 2021, a SNY and GP inmate were fighting on Facility D.

20. On July 20, 2021, a SNY got beat up by a GP inmate on Facility D.

21. On July 21, 2021, a SNY got beat up by a GP inmate on Facility D.

22. On July 21, 2021, a GP got beat up by a SNY inmate on Facility D.

23. On July 22, 2021, a SNY inmate got beat up by a GP inmate on Facility D-8.

24. On July 26, 2021, a SNY inmate got stabbed in Facility D-1.

25. On July 30, 2021, a GP got beat up by a SNY inmate in Facility D-3.

26. On July 31, 2021, a SNY got stabbed by a GP inmate in Facility D-2.

27. On August 2, 2021, there was a riot on Facility D Yard between multiple GP and SNY inmates resulting in several inmates being injured.

PBSP administration and the TLR was fully aware that these violent actions would take place from their personal experience with GP and SNY.  PBSP policy is to allow the aggressor to attack the non-aggressors, then take the aggressor to Ad-Seg and bring the non-aggressor back to

8

go another round of violence.

On August 13, 2021 Plaintiff received a response on appeal PBSP 132240 from Chief Deputy Warden R. Bell stating: A thorough investigation was conducted into this matter and the appeal is denied.  The response does not mention anything about the violent acts that have been taking place at PBSP.  (*Id.* at 68–69.)

California Penal Code 5058 gives the Secretary of CDCR the authority to promulgate rules and regulations for CDCR, but before the rules and regulations can be applied, they have to be adopted through the California Administrative Procedure Act (APA) under Cal. Gov. Code sections 11340.5 and 11346.2 by the OAL.

CDCR has not had the NDPF adopted through the APA and just promulgated the power of the rule making decision to themselves, in violation of Cal. Gov. Code 11340.5.  (*Id.* at 45, 61.)

The NDPF would always violate the Eighth Amendment, because it infringes on Plaintiff's constitutional rights by forcing SNY inmates and GP inmates that are gang members and associates of gang members to put their lives in danger by integrating with each other, and put the GP inmates in a position of being retaliated against by other GPs and gang members for associating with SNYs.

The NDPF is a special program which Plaintiff never asked to be in, and it would be illegal to force him as a GP inmate into a program that integrates with SNYs and place his life in danger, when CDCR did not have the authority to force him to do so.  CDCR would not make Levels III and IV NDPF.  Inmates and C/O's would get killed.

These actions by Defendants have disrupted Plaintiff's positive programming and created an adverse action in Plaintiff's daily prison life, now his life is threatened by these violent actions.

First Claim – Deliberate Indifference Failure to Protect (Against S. Kernan)

In committing the acts set forth above, Plaintiff alleges Defendant Kernan conspired with Defendants Allison, Diaz, Macomber, Gipson, and Voong to put out an underground memorandum to all CDCR top executives to implement a policy of forcing GP inmates and SNYs who are really protective custody (PC) inmates to integrate on yards and call these yards NDPF. Defendants also state inmates' non-compliance with transfer and housing placement

recommendation shall be subject to the department disciplinary process and potential placement into a higher level housing.  (*Id.* at 38.)

Second incident, Plaintiff is associate of a street gang called Compton Neighborhood Crips (NHC) and still associates with them.  CDCR refers to this gang in prison as a strategic threat group (STG).  There are multiple NHC along with other Compton Crips in CDCR, and if it was known to them Plaintiff was on a NDPF with SNY inmates they would stab or assault him for it in violation of Plaintiff's Eighth Amendment constitutional rights.

By Defendant Kernan subjecting Plaintiff to cruel and unusual punishment by being deliberately indifferent to his health and safety needs, Defendant denied Plaintiff of the minimal civilized measure of life necessities and exposed Plaintiff to substantial risk of harm in violation of Plaintiff's Eighth Amendment constitutional rights.

By Defendant's conduct, Plaintiff was deprived of rights, privilege, and immunities secured to him by the Eighth Amendment of the U.S. Constitution and laws thereunder.

As a result of the aforesaid act and omissions of Defendant Kernan, Plaintiff has become mentally upset, distressed and aggravated by reasons of aforedescribed acts, omissions of Defendant, Plaintiff suffer numerous injuries including, but not limited to, humiliation, indignities.  Plaintiff claims compensatory damages to be proven at trial.

The aforementioned acts of Defendant Kernan were unnecessary and wanton, infliction of pain, willful, malicious, oppressive, vexation, objective, subjective, deliberate, and done with reckless indifferent to and callous disregard for Plaintiff's rights and justify punitive damages to be proven at trial.

Second Through Sixth Claims – Deliberate Indifference Failure to Protect

Plaintiff brings the same Eighth Amendment claim against Defendants Allison, Diaz, Macomber, Gipson, and Voong as that brought against Defendant Kernan, set forth in Plaintiff's First Claim.

Seventh Claim – Retaliation (Against Defendant Kernan)

In committing the acts set forth above, Plaintiff alleges Defendant Kernan conspired with Defendants Allison, Diaz, Macomber, Gipson, and Voong to send a memorandum to their

subordinates to retaliate against GP and SNY inmates for refusing to go to a NDPF.  In response
to filing a grievance regarding his health and safety Defendant retaliated against him by sending
him to a Level II NDPF, placing his life in danger.  Plaintiff is an associate of the street gang
NHC, a STG, and there are multiple NHC along with other Compton Crips in CDCR, and if it
was known to them he was on a NDPF with SNY inmates they would stab or assault Plaintiff for
it.

The NDPF is a special program, which Plaintiff never asked to be in and it would be
illegal to force him into a program that places his life in danger.  California Penal Code 5058
gives CDCR Secretary the authority to promulgate rules and regulations for CDCR.  Before the
rules and regulations can be applied they have to be adopted through the California
Administrative Procedure Act (APA) under Cal. Gov. Code. Sections 11340.5 and 11346.2 by the
OAL.  CDCR has not had the NDPF adopted through the APA.  Defendant was in a position to
take corrective action and failed to do so in violation of his First Amendment rights and that
Defendant chilled the effect of Plaintiff's exercise of his First Amendment rights through actions
that did not advance any legitimate penological interest nor tailored narrowly enough to achieve
such goals.

By Defendant Kernan retaliating against Plaintiff for exercising his First Amendment
rights Plaintiff suffered a chilling effect.

By Defendant's conduct Plaintiff was deprived of rights, privileges and immunities
secured to him by the First Amendment of the U.S. Constitution and laws enacted thereunder.

As a result of the aforesaid acts and omissions of Defendant Kernan Plaintiff has become
mentally upset, distress and aggravated by reason aforedescribed acts and omissions of
Defendant, Plaintiff suffer numerous injuries, mental and emotional pain and suffering.  Plaintiff
claims compensatory damages to be proven at trial.

The acts by Defendant Kernan were willful, wanton, malicious, oppressive, vexation,
deliberate and done with reckless indifference to and callous disregard for Plaintiff's rights and
justify an award of punitive damages to be proven at trial.

///

1    Eighth Through Eleventh Claims – Retaliation

2    Plaintiff brings the same First Amendment claim against Defendants Allison, Diaz,

3    Macomber, Gipson as that brought against Defendant Kernan, set forth in Plaintiff's Seventh

4    Claim.

5    As to the Tenth Claim, Plaintiff further alleges that he filed multiple appeals with

6    Defendant Macomber regarding his constitutional rights being violated and he has personally

7    reviewed them.

8    As to the Eleventh Claim, Plaintiff further alleges that he has filed multiple appeals with

9    the Third Level Review (TLR) regarding his constitutional rights being violated and Defendant

10   Voong has personally reviewed them.  Plaintiff's protected conduct was the motivating factor

11   behind Defendant's conduct to deny his appeal.  Defendant Voong intentionally falsified his

12   investigation report into this matter by misrepresenting the facts which reads in part: The TLR

13   notes that Plaintiff has not received any disciplinary action in regard to the refusal to participate

14   in NDPF housing.  CCR Title 15 3000, which was promulgated through the APA, specifically

15   states, regardless of circumstances, every person confined or residing in facilities of the

16   Department is subject to the rules and regulation of the Secretary, along with California Penal

17   Code 5058, the Secretary of the Department is authorized to establish rules to govern the

18   classification of inmates to ensure the safety and security of staff, inmates and public.  (*Id.* at 45,

19   53–54.)

20   Damages

21   Plaintiff requests compensatory and punitive damages, and the following injunctive relief:

22   1.  Ordering Defendants to immediately refrain from their policy of and procedure of

23   forcing Plaintiff as a GP inmate to place his life in physical danger by participating in

24   the NDPF.

25   2.  Have Defendant refrain from disciplining Plaintiff for refusing to participate in the

26   NDPF by taking all of his personal property.

27   3.  Have Defendants expunge the CDCR Rule Violation Report from Plaintiff's central

28   file, for forcing him to be disciplined for refusing to go to a NDPF.

12

1      4.   Make Plaintiff single cell permanently for placing Plaintiff's life in danger.

**III.   Discussion**

Plaintiff's second amended complaint again fails to state a cognizable claim for relief and fails to comply with Federal Rule of Civil Procedure 8.

### A.   Federal Rule of Civil Procedure 8

Pursuant to Rule 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted). Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). While factual allegations are accepted as true, legal conclusions are not. *Id.*; *see also Twombly*, 550 U.S. at 556–57; *Moss*, 572 F.3d at 969.

Plaintiff's second amended complaint is not short, and it is not a plain statement of his claims. Plaintiff's allegations are conclusory and generalized statements of law unsupported by any facts. Plaintiff's complaint does not contain enough factual content to permit the Court to draw the reasonable inference that Defendants are liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Therefore, Plaintiff's complaint does not comply with the requirements of Rule 8(a)(2).

### B.   Supervisory Liability

To the extent that Plaintiff seeks to hold Defendants liable based solely upon their supervisory roles, Plaintiff may not do so. Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of respondeat superior. *Iqbal*, 556 U.S. at 676–77; *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1020–21 (9th Cir. 2010); *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009); *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).

Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045

1  (9th Cir. 1989); *accord Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011); *Corales v.*

2  *Bennett*, 567 F.3d 554, 570 (9th Cir. 2009).  Supervisory liability may also exist without any

3  personal participation if the official implemented "a policy so deficient that the policy itself is a

4  repudiation of constitutional rights and is the moving force of the constitutional violation."

5  *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations and quotations

6  marks omitted), abrogated on other grounds by *Farmer v. Brennan*, 511 U.S. 825 (1970).

7          In this case, Plaintiff alleges that Defendants, who are all supervisory officials, are liable

8  in their individual capacities for violating his rights by implementing a policy that merges GP and

9  SNY inmates into NDPFs, and thereby forcing Plaintiff, who is a GP inmate, to associate with

10  SNY inmates.  However, Plaintiff has failed to allege facts demonstrating that the policy to merge

11  GP and SNY prisoners into NDPFs is itself a repudiation of Plaintiff's constitutional rights.

12          Plaintiff presents a laundry list of incidents of violence against both SNY and GP inmates

13  that occurred between May 2021 and August 2021 at PBSP, well after this action was filed.

14  While some of these violent incidents occurred between GP and SNY inmates, others state only

15  that a GP or SNY inmate was beaten up or stabbed, without specifying whether the perpetrator of

16  the violence was either a GP or SNY inmate.  In addition, none of these listed incidents specify

17  whether the motivation for the violence was the fact that one inmate was GP and another was

18  SNY, and none of them appear to involve Plaintiff.

19          In addition, Plaintiff states in a conclusory fashion that his own rights will be violated if

20  he is forced to program on a NDPF, because he is a member of a street gang and other members

21  of the gang will consider him a SNY inmate and assault him.  However, Plaintiff has not alleged

22  any specific facts indicating that he has been subjected to an actual, non-speculative risk of harm

23  as a result of programming with SNY inmates following Defendants' implementation of the

24  NDPF policy.  It appears to the Court that Plaintiff has successfully programmed on a NDPF for

25  at least several months prior to the filing of the second amended complaint, without any

26  involvement in the alleged incidents of violence at that facility.  Therefore, Plaintiff has not

27  sufficiently pled a cognizable claim of supervisory liability based on a constitutionally deficient

28  policy against any of the named defendants.

1      **C.     CDCR Implementation of the NDPF Policy**

2          Under the Eighth Amendment, prison officials have a duty to protect prisoners from

3   violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "[A]

4   prison official violates the Eighth Amendment only when two requirements are met.  First, the

5   deprivation alleged must be, objectively, sufficiently serious; a prison official's act or omission

6   must result in the denial of the minimal civilized measure of life's necessities." *Id.* at 834

7   (internal quotation marks and citations omitted).  "For a claim (like the one here) based on a

8   failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a

9   substantial risk of serious harm." *Id.*  Second, the prison official must subjectively have a

10  sufficiently culpable state of mind, "one of deliberate indifference to inmate health or safety." *Id.*

11  (internal quotation marks and citations omitted).  The official is not liable under the Eighth

12  Amendment unless he "knows of and disregards an excessive risk to inmate health or safety; the

13  official must both be aware of facts from which the inference could be drawn that a substantial

14  risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  Then, the official

15  must fail to take reasonable measures to abate the substantial risk of serious harm. *Id.* at 847.

16  Mere negligent failure to protect an inmate from harm is not actionable under § 1983.  *Id.* at 835.

17               1.     Facial Challenge

18          A constitutional challenge to a policy is "'facial' [if] it is not limited to plaintiff['s]

19  particular case, but challenges application of the law more broadly. . . ." *John Doe No. 1 v. Reed*,

20  561 U.S. 186, 194 (2010) (facial challenges "reach beyond the particular circumstances of these

21  plaintiffs.")  Facial challenges are disfavored. *Wash. State Grange v. Wash. State Republican*

22  *Party*, 552 U.S. 442, 450 (2008).  "A facial challenge to a [policy] is, of course, the most difficult

23  challenge to mount successfully, since the challenger must establish that no set of circumstances

24  exists under which the [policy] would be valid.  The fact that the [policy] might operate

25  unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly

26  invalid[.]" *United States v. Salerno*, 481 U.S. 739, 745 (1987).

27          Here, Plaintiff has not alleged any facts demonstrating that implementation of the NDPF

28  policy would always violate the Eighth Amendment, no matter which SNY or GP inmates or

15

1  which facilities the policy was applied to.  As discussed above, although Plaintiff has included a

2  list of violent incidents at PBSP in the months prior to filing the second amended complaint, it is

3  not clear whether any of those incidents was motivated by the integration of GP and SNY

4  inmates, or by some other reason.  As Plaintiff has not included allegations that the policy would

5  be unconstitutional as applied in all situations, Plaintiff has not pled a cognizable claim against

6  Defendants that the NDPF policy is facially invalid under the Eighth Amendment.

7  2.  <u>As Applied Challenge</u>

8  "'[A] [policy] . . . may be held constitutionally invalid as applied when it operates to

9  deprive an individual of a protected right although its general validity as a measure enacted in the

10  legitimate exercise of state power is beyond question.'"  *Little v. Streater*, 452 U.S. 1, 16 (1981)

11  (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).  Thus, to support an "as applied"

12  challenge, Plaintiff must show that his individual circumstances make the general application of

13  the NDPF policy unconstitutional.  *See Doe v. United States*, 419 F.3d 1056, 1063 (9th Cir.

14  2005).

15  Here, Plaintiff alleges that the NDPF policy, if applied to him, would place Plaintiff's life

16  in jeopardy because he would be on a yard with known snitches, and he is an associate of a street

17  gang that exists throughout CDCR.

18  However, Plaintiff has not alleged any facts to support his conclusory allegation that

19  implementation of the NDPF policy places Plaintiff at serious risk of harm or injury.  In fact,

20  Plaintiff does not allege that he has any known enemies, or that he was threatened with an assault

21  by any person or group, that would have been, or were housed, on any NDPF yard that Plaintiff

22  was, or would have been, housed at.  Therefore, Plaintiff has not sufficiently pled that he has been

23  incarcerated under conditions posing a substantial risk of serious harm because "speculative and

24  generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial

25  risk of serious harm to his future health."  *Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir.

26  2007).

27  Plaintiff has not pled a cognizable claim against any Defendants that, as applied to

28  Plaintiff, the NDPF policy is invalid under the Eighth Amendment.

**D.    Retaliation**

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a section 1983 claim.  *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985); *see also Valandingham v. Bojorquez*, 866 F.2d 1135 (9th Cir. 1989); *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005); *accord Watison v. Carter*, 668 F.3d 1108, 1114–15 (9th Cir. 2012); *Silva*, 658 at 1104; *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

Plaintiff alleges that after he filed an appeal regarding his refusal to integrate on a non-designated yard, Defendants retaliated against him by sending him to a Level II NDPF, and that Defendant Voong retaliated against him by intentionally falsifying his investigation report and misrepresenting facts in the Third Level of Review.  Plaintiff pleads in a conclusory fashion that these acts chilled the exercise of his First Amendment rights.

As discussed above, Defendants' implementation of the NDPF policy (by sending Plaintiff to a Level II NDPF in accordance with that policy), does not rise to the level of a constitutional violation, and further does not constitute an adverse action.  Rather, given Plaintiff's filing of an appeal regarding his refusal to go to a NDPF, it appears that Plaintiff was already being sent to a NDPF.

As to Plaintiff's allegation that Defendant Voong was retaliating against him by misrepresenting facts in the Third Level Review of his appeal, Plaintiff has not identified which portion of the review was falsified, if any, and therefore appears to be challenging only the denial of his appeal.  Plaintiff cannot pursue any claims against prison staff based solely on the processing and review of his inmate appeals.  Plaintiff does not have a constitutionally protected right to have his appeals accepted or processed.  *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir.2003); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.19 88).  The prison grievance procedure

1   does not confer any substantive rights upon inmates and actions in reviewing appeals cannot

2   serve as a basis for liability under section 1983. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th

3   Cir.1993); *see also Wright v. Shannon*, No. 1:05-cv-01485-LJO-YNP PC, 2010 WL 445203, at

4   *5 (E.D. Cal. Feb. 2, 2010) (plaintiff's allegations that prison officials denied or ignored his

5   inmate appeals failed to state a cognizable claim under the First Amendment).  Denial or refusal

6   to process a prison grievance is not a constitutional violation. *Rushdan v. Gear*, No. 1:16-cv-

7   01017-BAM (PC), 2018 WL 2229259, at *6 (E.D. Cal. May 16, 2018).  Accordingly, Plaintiff

8   fails to state a cognizable claim arising out of the screening or processing of his appeal.

9          **E.      Custody Level**

10          Plaintiff appears to assert a claim regarding his custody level.  However, a prisoner does

11   not have a right to a particular classification or custody level under the Due Process Clause. *See*

12   *Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007) (concluding California prisoner does not

13   have liberty interest in residing at a level III prison as opposed to level IV prison); *Hernandez v.*

14   *Johnston*, 833 F.2d 1316, 1318 (9th Cir.1987) ("'[A] prisoner has no constitutional right to a

15   particular classification status.'") (quoting *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976)).

16   Further, Plaintiff cannot state a cognizable claim under the Eighth Amendment based on any

17   alleged improper classification. *Myron*, 476 F.3d at 719 (finding that alleged improper

18   classification to a "level IV" prison does not amount to an infliction of pain and is not condemned

19   by the Eighth Amendment).

20          **F.      Challenge to Rules Violation Report**

21          It has long been established that state prisoners cannot challenge the fact or duration of

22   their confinement in a section 1983 action and their sole remedy lies in habeas corpus relief.

23   *Wilkinson v. Dotson*, 544 U.S. 74, 78 (2005).  Often referred to as the favorable termination rule

24   or the *Heck* bar, this exception to section 1983's otherwise broad scope applies whenever state

25   prisoners "seek to invalidate the duration of their confinement-either directly through an

26   injunction compelling speedier release or indirectly through a judicial determination that

27   necessarily implies the unlawfulness of the State's custody." *Wilkinson*, 544 U.S. at 81; *Heck v.*

28   *Humphrey*, 512 U.S. 477, 482, 486–87 (1994); *Edwards v. Balisok*, 520 U.S. 641, 644 (1997).

1    Thus, "a state prisoner's [section] 1983 action is barred (absent prior invalidation)—no matter the

2    relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state

3    conduct leading to conviction or internal prison proceedings)—if success in that action would

4    necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82.

5            Plaintiff is seeking expungement of a Rules Violation Report from his central file.  This

6    particular claim may be barred by *Heck*, 512 U.S. 477.  *Compare Edwards*, 520 U.S. at 646

7    (holding that § 1983 claim is not cognizable because allegations of procedural defects and a

8    biased hearing officer implied the invalidity of the underlying prison disciplinary sanction of loss

9    of good-time credits) with *Ramirez v. Galaza*, 334 F.3d 850, 858 (9th. Cir. 2003) (holding that the

10   favorable termination rule of *Heck* and *Edwards* does not apply to challenges to prison

11   disciplinary hearings where the administrative sanction imposed does not affect the overall length

12   of confinement and, thus, does not go to the heart of habeas).

13           Based on exhibits attached to the second amended complaint, it appears that Plaintiff lost

14   90 days of credit following the disciplinary hearing.  (ECF No. 46, p. 55.)  Though Plaintiff has

15   only asked for expungement of the RVR from his central file, Plaintiff may also be seeking

16   restoration of those lost credits.  A judgment in favor of Plaintiff on this claim would then

17   necessarily imply the invalidity of the disciplinary action, and Plaintiff has not demonstrated that

18   the disciplinary action has been "reversed on direct appeal, expunged by executive order, declared

19   invalid by a state tribunal authorized to make such determination, or called into question by a

20   federal court's issuance of a writ of habeas corpus."  *See e.g.*, *Cox v. Clark*, 321 Fed. Appx. 673,

21   676 (9th Cir. 2009) (affirming dismissal of due process claim pursuant to *Balisok* to the extent

22   that plaintiff sought restoration of good-time credits and the reversal of a disciplinary decision);

23   *McCoy v. Spidle*, 2009 WL 1287872, *7–*8 (E.D. Cal. May 6, 2009) ("A challenge under section

24   1983, seeking only damages and declaratory relief for procedural due process violations is also

25   barred if the nature of the challenge would necessarily imply the invalidity of the deprivation of

26   good-time credits.").

27   ///

28   ///

1

### G.   Prison Regulations

Plaintiff alleges violations of various prison rules, regulations and policies, including the California Penal Code and the California Administrative Procedures Act, by the Defendants.  To the extent that Plaintiff attempts to bring any claims solely based on a defendant's violation of prison rules and policies, he may not do so, as alleged violations of prison rules and policies do not give rise to a cause of action under § 1983.  Section 1983 provides a cause of action for the deprivation of federally protected rights.  "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, [s]ection 1983 offers no redress."  *Sweaney v. Ada Cty., Idaho*, 119 F.3d 1385, 1391 (9th Cir. 1997) (quoting *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 370 (9th Cir. 1996)); *see Davis v. Kissinger*, No. CIV S–04–0878-GEB-DAD-P, 2009 WL 256574, *12 n. 4 (E.D. Cal. Feb. 3, 2009).  Nor is there any liability under § 1983 for violating prison policy.  *Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009) (quoting *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997)).  Thus, the violation of any prison regulation, rule or policy does not amount to a cognizable claim under federal law, nor does it amount to any independent cause of action under section 1983.

### H.   Money Damages for Emotional Distress

Plaintiff seeks monetary damages from Defendants because he has become mentally upset, distressed, and aggravated by their acts and omissions, and he has suffered injuries including humiliation and great mental and emotional pain and suffering.  Plaintiff is advised that he may not obtain compensatory damages based on mental or emotional injury alone, without a showing of physical injury from the particular constitutional violation.  *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act."); *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002).  Plaintiff alleges neither physical injury nor sexual assault.  Therefore, on the facts as pled, Plaintiff is not entitled to monetary damages in this case for emotional distress.

///

**IV. Conclusion and Order**

For the reasons stated, Plaintiff's second amended complaint fails to comply with Federal Rule of Civil Procedure 8 and fails to state a cognizable claim for relief. Despite being provided with the relevant pleading and legal standards, Plaintiff has been unable to cure the deficiencies in his complaint by amendment, and thus further leave to amend is not warranted. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).

Accordingly, it is HEREBY RECOMMENDED that this action be dismissed, with prejudice, for failure to state a cognizable claim upon which relief may be granted.

These Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with these Findings and Recommendation, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **September 30, 2021**          /s/ *Barbara A. McAuliffe*

UNITED STATES MAGISTRATE JUDGE